**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Plaintiff,

vs.

Kashmir Khaliffa McReynolds,

Defendant.

Crim. No. 25-CR-225(1) PJS/DJF

**DEFENDANT'S TRIAL BRIEF AND MOTIONS IN LIMINE**

Pursuant to the Court's June 18, 2026 Order (ECF No. 104), Defendant Kashmir Khaliffa McReynolds, by and through his undersigned counsel, respectfully submits the following Trial Brief and Motions in Limine. Counsel met and conferred on September 14, 2026 to discuss disputed evidentiary issues for trial.

## SUMMARY OF THE EVIDENCE AT TRIAL

### I. Factual Background

#### A. Mr. McReynolds Worked for 21 Days of Peace.

Mr. McReynolds is a 36-year-old man with a fiancé and young children. From June 2023 to March 2025, Mr. McReynolds worked on a community patrol team for a peace-keeping organization called 21 Days of Peace. The 21 Days of Peace program was intended to create safe streets through consistent patrolling and community engagement. The 21 Days of Peace community patrollers included persons of all backgrounds—some with prior felony convictions and others without any such criminal history. They would walk through the streets and provide various types of support, including dispensing

Narcan to people who are overdosing, providing food to the homeless, and building relationships with community members in order to resolve conflicts.

Mr. McReynolds was a patroller in between the Cleveland and Folwell neighborhoods of North Minneapolis, around the intersection of 36th Avenue North and Penn Avenue North (the "36th & Penn" area). Other 21 Days of Peace workers would join Mr. McReynolds on his shifts, including the organization's director of operations, Turkessa Ford and its founder Reverend Jerry McAfee. The 36th & Penn area is a dangerous part of town, so much so that Mr. McReynolds consistently wore a bulletproof vest during his shifts for 21 Days of Peace in order to protect himself from gun violence. He did not carry a firearm during his shifts, but he had a permit to carry a firearm and did so while off the clock.

**B. Mr. McReynolds Was Shot on March 10, 2025.**

Mr. McReynolds worked a shift for 21 Days of Peace from 3:00 p.m. to 9:00 p.m. on March 10, 2025. He and other 21 Days of Peace patrollers would "clock in" and "clock out" of their shifts by texting in a group message chain with Ms. Ford. The organization did not use a formal time entry system, so Ms. Ford would record the times that the patrollers texted in order to pay them each month.

On March 10, 2025, Mr. McReynolds and others were patrolling the 36th & Penn area. Around 4:30 p.m., they started a barbeque where they fed members of the community. One of the other 21 Days of Peace workers present at the barbeque was Alvin Watkins who had worked with Mr. McReynolds during his shift earlier in the day. At the end of the barbeque, around 9:00 p.m., Mr. McReynolds clocked out of his shift

and stayed in the area to help clean up. After clocking out, Mr. McReynolds retrieved one of his firearms that he had a license to carry from his vehicle.

After the sun went down, an unknown shooter or shooters fired approximately 30 rounds from a fully automatic weapon in the direction of a group of people, which included Mr. McReynolds. The shooters fired from the alleyway behind an abandoned house near the barbeque. Mr. McReynolds started to run away but was shot three times: one hit to the shoulder; one graze to his neck, which he thought at the time was a shot to the back of his head; and one shot to his torso, which his bulletproof vest stopped. Mr. McReynolds was the only person who was shot or otherwise injured during the incident.

Part of the incident was captured on video from nearby surveillance cameras. For example, one video will show a group of people scattering from the barbeque when the unknown shooters opened fire. Another video will show Mr. McReynolds laying on the ground after being shot and then standing up. While dazed from just being shot, Mr. McReynolds walked down a street and yelled out "grab my chop, grab my chop." He also returned fire toward the abandoned houses where he thought the shooters were located. He later learned that Mr. Watkins (who has a felony conviction) had been standing near him when he yelled "grab my chop." The two men eventually got away from the scene, and police officers found Mr. McReynolds sitting in his vehicle on Penn Avenue around 9:40 p.m.

Mr. McReynolds was taken to the hospital for treatment of his gunshot wounds, where he was admitted at 10:07 p.m. There, he was given an opioid pain medication, hydromorphone. He also spoke to a police officer while in the hospital, and the officer gave him a "blue card," a type of card typically given to crime victims with information

about the officer. His significant other, Lovely Milon, will testify that she visited him in the hospital and observed that he was disoriented and acting differently than normal.

Mr. McReynolds was discharged the next day with prescriptions for, among other things, hydroxyzine and methocarbamol, which can cause confusion, drowsiness, dizziness, and mood changes. In the days after being discharged from the hospital, Mr. McReynolds took all of his prescribed medications every day. While on the medication, and experiencing the trauma of a recent violent shooting, he was forgetful, so Ms. Milon had to help him manage his medications and wounds and complete daily activities like getting dressed. He was confused about what happened to him.

### C. Police Interviewed Mr. McReynolds While He Was Recuperating From Gunshot Wounds, Experiencing Side Effects of Medication, and Suffering Trauma From Being Shot.

In the days following the shooting, Ms. Milon and Mr. McReynolds spoke to Sergeant Brandon Noble, who was investigating the incident along with Sergeant Gilles Antaya. Sergeant Noble spoke with Ms. Milon regarding Mr. McReynolds' property that was in police possession, and on the call he referred to Mr. McReynolds as a "victim."

Sergeant Noble then spoke with Mr. McReynolds and asked Mr. McReynolds to come to the police station to talk about the shooting. During this call, Sergeant Noble never told Mr. McReynolds he was considered as a suspect under investigation or that officers wanted to arrest him. Ms. Milon ultimately advised Mr. McReynolds to talk to police to "give his side" because they believed the police were going to help find Mr. McReynolds' assailants.

Prior to speaking to police on March 14, 2025, Mr. McReynolds took all of his prescribed medication, which included drugs that could cause drowsiness and confusion,

hydroxyzine and methocarbamol. Approximately an hour after taking the medication, Ms. Milon drove him to the police station and observed that he appeared confused.

After Mr. McReynolds arrived, Sergeant Noble introduced himself and asked how Mr. McReynolds was doing. Mr. McReynolds said he was "sore." Sergeant Antaya also introduced himself and tried to shake Mr. McReynolds hand, but Mr. McReynolds could barely move to shake hands. Mr. McReynolds continuously closed his eyes or only partially opened them, had a hood pulled over his head, and attended the interview with the founder of 21 Days of Peace, Reverend Jerry McAfee, as support. Despite seeing that Mr. McReynolds was visibly impaired, and being aware that Mr. McReynolds had been shot three times on March 10, Sergeant Noble did not ask any follow-up questions about how Mr. McReynolds was feeling and never asked if Mr. McReynolds was on medications.

The two officers and Mr. McReynolds then entered a small interview room where they sat around a table. Sergeant Antaya told Mr. McReynolds that the purpose of the meeting was to "basically get your side of the story, what you say, from your perspective." He mentioned that the officers may need to take photographs of Mr. McReynolds' injuries and that they were going to receive his medical records from the hospital. Sergeant Antaya explained, "we have to do that so we can help in prosecution if we find the guys that shot at you." Neither officer told Mr. McReynolds that they were there to arrest him. As the interview began, Sergeant Antaya stated, "it is my understanding that you fired back… because of that we do have to read you *Miranda*, okay? It's kind of just to make sure everything's formal and that." Sergeant Antaya then read the *Miranda* warnings and began questioning.

During the interview, Mr. McReynolds told officers he had trouble remembering what happened because he was on medication. He had trouble recalling his parents' address and information about his significant other, including her middle name, date of birth, and phone number. Dr. Scott-Morrow will testify that—based on her review of the recorded interview—Mr. McReynolds viscerally re-experienced the trauma he suffered from the March 10 shooting during the police interview. These conditions of Mr. McReynolds' interrogation are relevant "to the ultimate factual issue of the defendant's guilt or innocence," because they go to the credibility of Mr. McReynolds' statements to police. *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

## II. Elements of the Charge Against Mr. McReynolds

### A. The Indictment Charges Mr. McReynolds with Disposing of a Firearm to a Felon (18 U.S.C. § 922(d)(1)). [1]

The Government charged Mr. McReynolds with disposing of a firearm to a convicted felon in violation of 18 U.S.C. § 922(d)(1) (Count 2). To prove this count, the Government will need to establish beyond a reasonable doubt that Mr. McReynolds "dispose[d] of any firearm . . . to any person knowing or having reasonable cause to believe that such person . . . has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." *Id.*

### B. Mr. McReynolds Did Not Knowingly Dispose Of a Firearm to Mr. Watkins.

The Indictment alleges that Mr. McReynolds was telling Mr. Watkins to grab a firearm with the statement to "grab my chop," but the evidence will not support this

[1] On September 11, 2026, the Government filed a motion to dismiss Count 3 of the Indictment (ECF No. 115), which charged Mr. McReynolds with possession of a firearm while employed for a felon in violation of 18 U.S.C. § 922(h).

conclusion. When calling out for someone to help him by grabbing the firearm, Mr. McReynolds never referred to Mr. Watkins by name. Additionally, the area was dark, making it difficult for Mr. McReynolds to see who he was speaking with. There were multiple people present at the barbeque immediately before the shooting, and it would have been unclear to Mr. McReynolds to whom he was speaking. Mr. McReynolds never handed Mr. Watkins a firearm nor asked him to use one. Accordingly, the government will be unable to prove beyond a reasonable doubt that Mr. McReynolds knew he was speaking to Mr. Watkins when he yelled, "grab my chop, grab my chop."

Further, the evidence will show that Mr. McReynolds was acting in self-defense when he yelled "grab my chop, grab my chop." Mr. McReynolds' expert witness, Dr. Leesa Scott-Morrow, will explain how the trauma of being shot multiple times, as happened to Mr. McReynolds, impacts mental functioning and behavior. Dr. Scott-Morrow will explain that stress from life-threatening situations, such as being shot, negatively and instantaneously impacts attention and focus, memory formation, and decision making. The person experiencing such a life-threatening risk will enter a "fight or flight response." Dr. Scott-Morrow has opined that Mr. McReynolds experienced a life-threatening situation when he was shot on March 10, 2025 which prevented him from responding rationally to the situation. She developed this opinion based on a video recording of Mr. McReynolds taken moments after he was shot.

### C. Mr. McReynolds Did Not Know Alvin Watkins Was a Felon.

The evidence at trial will further show that Mr. McReynolds did not know, and did not have reason to know, that Mr. Watkins had a felony conviction. First, Mr. McReynolds did not have actual knowledge of Mr. Watkins' felony. The government's

evidence of Mr. McReynolds knowledge will consist of a police interview where Mr. McReynolds said he "didn't know" if several people including Mr. Watkins, had felony convictions, but that he "think[s]" they did. Witnesses will testify that they never observed Mr. Watkins telling Mr. McReynolds about having a felony conviction.

Second, Mr. McReynolds did not have reason to know about Mr. Watkins' felony conviction. Witnesses will testify that the two men were not close friends but were merely co-workers. Further, it would be uncommon in their jobs and in their community ask whether someone has a felony conviction.

## EVIDENTIARY ISSUES AND MOTIONS IN LIMINE

### I. Legal Standards

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is inadmissible. Fed. R. Evid. 402. Even if evidence is relevant, the Court may exclude it "if its probative value is substantially outweighed by a danger of… unfair prejudice." Fed. R. Evid. 403.

Under Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *United States v. Johnson*, 439 F.3d 884, 887 (8th Cir. 2006) (reversing a district court's judgment and remanding for a new trial following the admission of propensity evidence) (citing Fed. R. Evid. 404(b)). Testimony is only admissible under Rule 404(b) if it is "(1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value."

*United States v. Gomez-Diaz*, No. 16-cr-348 (RHK/BRT), 2017 U.S. Dist. LEXIS 127270, at *6 (D. Minn. Aug. 9, 2017) (quoting *United States v. Thomas*, 593 F.3d 752, 757 (8th Cir. 2010)).

"Statements" that the declarant did not make "while testifying at the current trial" and which a party intends to offer "in evidence to prove the truth of the matter asserted" are hearsay. Fed. R. Evid. 801. Hearsay evidence is inadmissible unless an exception to the hearsay rule applies. Fed. R. Evid. 802-04.

## II. Motion in Limine 1: Evidence of Mr. McReynolds' Alleged Prior Bad Acts is Irrelevant and Unduly Prejudicial.

Under Rules 401, 403, and 404(b) of the Federal Rules of Evidence, Mr. McReynolds moves this Court in limine for an Order precluding the Government from offering irrelevant and unfairly prejudicial evidence regarding his knowledge of a violent dispute on March 10, 2025.[2]

The Government advised that it intends to introduce evidence that Mr. McReynolds texted with other individuals about a potentially violent dispute between March 9 and 10, 2025, including the following:

- March 9 text message that someone "wanted to try to come shoot . . . up" a funeral, but McReynolds and his friends "held it down."
- March 10 text message which the Government contends shows that Mr. McReynolds was prepared to "crank the murder rate," to "crash turn the city up," and to "push them buttons" and "let my puppy go crazy."
- March 10 text messages which the Government contends show Mr. McReynolds had disputes with men named Calico Rock and Mista Money:

[2] Pursuant to counsel's meet and confer, Mr. McReynolds understands that the Government does not intend to offer evidence of Mr. McReynolds being involved in the sale of marijuana. To the extent the Government intends to introduce any evidence of Mr. McReynolds' possession or use of marijuana, Mr. McReynolds seeks to exclude that evidence as irrelevant and unfairly prejudicial under Rules 401, 403, and 404(b).

> (1) "only person don't like me is calico rok aka tye banks but he not allowed around the brothers. . . . I'm have my new vest on toady at work tho. His brother know u . . . he go by neno. N a slight fall out with mista money mann he just be acting weird lord be" and (2) "mista money man he just been giving kinda shady vibes n playing to much."

The Government contends that this is intrinsic evidence because it provides "context" for the crime charged and shows Mr. McReynolds' "motive" for disposing of a firearm to a felon. But, evidence that provides "context" for a crime must still be "inextricable" from the Government's case. *United States v. Johnson*, 463 F.3d 803, 805, 808 (8th Cir. 2006) (evidence of the defendant giving clients "kickbacks" was admissible in a case where the Government alleged the defendant committed mail fraud in exchange for such "kickbacks"). The text messages here have no bearing on the case against Mr. McReynolds in which the Government charges him with disposing of a firearm to a felon after he had just been shot three times. Mr. McReynolds' alleged intent to arm *himself* when he had a permit to carry a firearm shows nothing about whether he intended to dispose of a firearm to *someone else*.

Rather, the text messages constitute prior bad act evidence under Rule 404(b), and they are inadmissible under the four-factor test outlined above. Mr. McReynolds is charged with disposing of a firearm to a felon under 18 U.S.C. § 922(d). No element of this charge requires a showing that Mr. McReynolds had knowledge of a hypothetical violent dispute. There is also no evidence that Calico Rock or Mista Money were the individuals who shot Mr. McReynolds on March 10, 2025. Indeed, neither the Government nor the police know who shot Mr. McReynolds that night. The Government will not be able to prove by a preponderance of evidence either that Mr. McReynolds was planning to be involved in a violent incident or the identities of the shooters.

Accordingly, evidence of Mr. McReynolds' knowledge of a violent dispute is (1) irrelevant to the material issues in this case, (2) dissimilar from the crimes charged, (3) insufficient to support a jury finding that Mr. McReynolds committed the crime charged, and (4) more prejudicial than probative.

If the Government persists with the theory that Mr. McReynolds' texts show he was planning to be involved in some sort of dispute, they would still not be relevant, because Mr. McReynolds has a license to carry a firearm. There was nothing illegal about Mr. McReynolds arming himself. Punishing him for doing so is contradictory to the Second Amendment, which provides Mr. McReynolds with the right to keep and bear arms. *See*, *e.g.*, *N.Y. Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

Even if this evidence were material to the claims at issue in this case, which it is not, the information would be more prejudicial than probative. Courts exclude evidence under Rule 403, and the fourth prong of the *Sykes* test, where, as here, the information does not have a bearing on the facts of the case and its admission may lead jurors to "simply convict this defendant of charged offenses because he is a 'bad actor.'" *United States v. Lee*, No. CR 07-3004-MWB, 2007 U.S. Dist. LEXIS 36073, at *10 (N.D. Iowa May 17, 2007); *see also United States v. Roenigk*, 810 F.2d 809, 815 (8th Cir. 1987) ("The problem with excessive references to the details of prior criminal conduct is that the jury is likely to infer that the defendant is more likely to have committed the offense for which he is being tried than if he had previously led a blameless life."). In this case, there is no basis for claiming that the evidence of a hypothetical violent incident could

support the Government's position in this case, and therefore their admission may simply lead a jury to convict Mr. McReynolds for being a "bad actor." Given the highly prejudicial nature of this evidence, this Court should exclude references to this evidence under Rules 403 and 404(b).

## III. Motion in Limine 2: Evidence of Mr. McReynolds Firing Shots at the Attackers Is Irrelevant and Unduly Prejudicial.

Pursuant to Rules 401 and 403 of the Federal Rules of Evidence, Mr. McReynolds moves this Court in limine for an order precluding the Government from offering irrelevant and unfairly prejudicial evidence of him returning fire toward his shooters on the night of March 10, 2025.

Mr. McReynolds anticipates that the Government will attempt to admit evidence that he shot back at the perpetrators who shot him on March 10, 2025, including but not limited to the following portions of a recorded statement which Mr. McReynolds made to Sergeants Gilles Antaya and Brandon Noble:

| Timestamps | Content |
|---|---|
| 12:14:18-12:15:49 | A: I just got the-- jumped up, walked right back between the cars and start returning fire--boom boom boom boom boom boom boom-- towards the garage in the-- the house-- towards the abandoned houses-- the two houses where I seen them at and I'm like, man, I'm like I start just shooting towards that way where I seen them standing, where I seen the flash of the muzzle go off at, so I'm just shooting towards that way and then when I'm standing up, I get up and I look, and I'm like, I tell, I think-- I think AB become running back up. I'm like 'bro I'm hit, I'm hit in the neck.' He like, 'what?' He like 'man like what the heck?' I'm like, 'man I'm hit in the neck.' I take off from him. Literally, after I said I'm hit in the neck, I take off from him to go see if I can catch them at the front of the house.<br>Q: What do you mean?<br>A: I run, I take off from him in front of the house.<br>Q: In front of what house?<br>A: Um towards thirty-six and— |

| | |
|---|---|
| | Q: This is thirty-six here.<br>A: --and Queen.<br>Q: That's here.<br>A: I ran towards Queen to the corner<br>Q: So there's sidewalk here.<br>A: Yep so I ran towards-- I ran towards-- I ran past the alley from where we're standing by the parking lot after I literally-- after I just got down barking. I barked I empty my clip, I dropped that clip, and I threw it in my pocket or something or I dropped it by my car and I pop my other one in and I took off running towards thirty-six and Queen okay because I was trying to catch them at the front of the house like I was like my adrenaline so much pumping I'm like 'I got to catch them, I got to catch them, I got--' I'm like 'they just really just let off a switch at me or or a chopper.' At first I'm thinking it was a chopper like that. |
| 12:16:49-12:17:16 | I let off shots towards the the front of the crib of the abandon house and I'm like-- I let off-- I like I say I was left probably with about five shells left in my my second mag of letting off towards the abandoned house, and I'm like I'm just trying to see if like I'm like they around that house. They didn't run that quick to get away that quick. I'm like either they came through this abandoned way on Queen or they came straight up the alleyway about time I'm coming back— |
| 12:20:49-12:21:27 | Q: and then you get up and—<br>A: Start firing.<br>Q: Start firing back as you're going towards your car?<br>A: Yeah, I was walking-- I was walking towards my car way, which is this car here—<br>Q: by the trashcan.<br>A: Yeah, walked back in front of the car—<br>Q: You fired when you were back here?<br>A: Yeah.<br>Q: Okay, with your handgun?<br>A: Yeah.<br>Q: Okay, so you fired at them?<br>A: Yeah. With the 5.7.<br>Q: So, okay, were were they, when you were firing toward this abandoned house here, where they were at, where they had the switch, were they still firing at you?<br>A: No.<br>Q: Okay did you see them?<br>A: No I didn't. |
| 12:21:45-12:22:05 | Q: And you fired, what you said, whatever you had left in your clip?<br>A: Yeah |

| | |
|---|---|
| | Q: Down--down Queen Avenue?<br>A: Yeah… towards the houses.<br>Q: Towards the houses?<br>A: Yeah.<br>Q: This direction, towards the houses?<br>A: Yeah.<br>Q: But you never saw them run out?<br>A: No. I just let a few shots off towards the abandoned houses. |
| 12:27:09-12:27:23 | Q: Is that the pistol that you fired out here?<br>A: Yeah.<br>Q: Okay, what kind of pistol is that?<br>A: 5.7 Rover.<br>Q: Okay, and your rifle, you said it was a--?<br>A: M&P 22. |
| 12:29:42-12:30:08 | Q: When you're going through the course, did they go over anything with you about returning fire if you're in an incident where you need-- that you feel that you have to?<br>A: Yeah, when we're being fired upon, just like how we being fired upon, to return fire, just to-- um, delete the threat, so my main thing was to get up and delete the threat |
| 12:31:00-12:31:40 | Q: What about if you don't see them?<br>A: If you don't see 'em. Well, I'm not gon' lie, my adrenaline was going, my adrenaline was pumping. This was my first like real type like shoot out, dump out, type stuff. Ever me getting into something like that. So my adrenaline was just pumping of 'delete the threat, delete the threat, but think smarter but delete the threat' that's the way I was thinking and moving. Even though someway down the line where I know in a pinch in a glitch, you know you should've stopped firing. |
| 12:32:00-12:32:20 | Q: When you let off your initial shots, you were doing that to delete the threat is what you were saying. When you ran down to Queen Avenue and shot down the block there, what was your purpose at that point?<br>A: There was no real purpose at that point, I was just trying to scare them back towards the back of the house. |
| 12:35:33-12:36:43 | Q: When you were at Queen and you fired towards those houses or down the block, you never once saw those people?<br>A: No.<br>Q: Okay, if anybody would have ran out at that point, would you have just shot 'em?<br>A: Deep down, I would've.<br>Q: Okay, but not knowing if they were the shooter, right?<br>A: I-- but I'd of-- my main thing is I been so much on point I'd of made sure I would've seen a firearm, for sure for sure, before I just |

| | |
|---|---|
| | let it go in case 'cause I'm not trying to jeopardize myself or throw my whole, you know—<br>Q: So if you'd have saw them with a gun in their hand, you'd of fired? [inaudible]<br>A: Yeah, I'd of fired. If I'd've seen another firearm, I'd have thought that was them and I'd have fired.<br>Q: Okay but if they were just running through then what?<br>A: If they was just running through I'd of probably just been looking just to take cover just to make sure that—<br>Q: You would've fired at 'em then?<br>A: No, I'd've made sure that they-- I'd've made sure that literally had to get off on me a little bit—<br>Q: I swear you just said you would have fired on 'em?<br>A: [inaudible] if they had a gun in they hand, yes I would've fired. A person just running just running I'd've took cover just to make sure just a peep the scene of all man make sure before I'm just finna just let off. |
| 12:38:57-12:40:23 | Q: Did you ever see the guys over here when you were firing?<br>A: "No. My adrenaline was still just going after me just getting up.<br>Q: So, I gotta ask. What was the purpose of firing back this way?<br>A: 'Cuz I was just firing from the last spot that I seen them at. And that's what made me just start firing towards that way, of thinking that 'ah, they trying to run back through the gangway, so let me hurry up and try to run back towards the front part to see if they get in the vehicle.'<br>Q: Yep, we got that covered. I just want to make sure-- and and I understand what you're saying right. I just got to get it detailed. So you got hit, you get up, you're walking towards front of your car. You're firing the whole time, you said, right?<br>A: Yeah.<br>Q: The twenty rounds. You're firing towards us abandon house area where you saw them let off the switch?<br>A: Yeah.<br>Q: But as you're firing, you never saw anybody there.<br>A: No.<br>A: Okay, and I don't want to put words in your mouth, but you-- you believe they ran towards Queen?<br>A: Yes, sir.<br>Q: And that's why you went back towards Queen?<br>A: Yes, sir.<br>Q: And on the way you told AB you had a gun in your car?<br>A: Yep.<br>Q: But you never told him to get it?<br>A: No. I just said, 'my gun-- my other gun is in the car.' |

| | |
|---|---|
| | Q: Yep. And then you got to Queen and then you fired down Queen?<br>A: Yes, I fired down Queen towards the abandoned houses to make them run from the front to the back. Back towards the back.<br>Q: Where you believe they had we're going to run through? And you did that to push them back towards the alley. |
| 12:49:05-12:49:15 | It's on now, it's just like… [inaudible] delete the threat, delete the threat. |
| 12:57:12-12:57:46 | A: fired from where the tree stump was at towards that way…<br>Q: Can you draw an arrow with the blue like which direction you fired from there?... Q: And you're firing this whole time?<br>A: Yeah. It's where I first seen them standing at. |
| 12:58:23-12:58:26 | A: that's where I start firing again at |
| 12:59:13-12:59:34 | Q: did you ever fire towards this one?<br>A: I was just firing towards-- just towards the abandoned house. I just know I looked-- I looked trying to see a car trying to get out of there fast or see them guys running. |
| 1:02:33-1:03:44 | Q: Did they talk to you about duty to retreat?<br>A: Yeah.<br>Q: Okay, what does that mean to you?<br>A: To retreat-- the the fall back-- to fall back.<br>Q: What does it mean when you hear duty to retreat though? What is it? What does that mean to you?<br>A: To get out of there. Get away. Stop shooting. Everything stops.<br>Q: Okay. Do you feel you did that?<br>A: Um, adrenaline pumping-wise. No.<br>Q: Okay. Do you feel that, um-- so you don't felt like you retreated, because everything that was going on and your adrenaline—<br>A: I retreated-- I retreated after when I walked back from Queen.<br>Q: When you walked over to Queen, would it be a fair assessment to say that—<br>A: I ran over to Queen.<br>Q: Oh, ran over sorry. When you ran over to Queen, would it be fair that with your adrenaline and that, and as you stated before, you were trying to shoo them back and/or maybe shoot them, because they were shooting at you?<br>A: Yes. |
| 1:03:54-1:04:34 | Q: Well if you're firing off something, you're assaulting something, you know. Q: You indicated that you were trying to corral them back to the alley. That's what we're kind of getting at, buddy. Like, so by us saying that you were pressuring them by shooting your gun to go back to the alley, is that correct? |

| | |
|---|---|
| | A: Yes. Q: Okay, you were aggressing them to go back to the alley with your gun, which would kind of make it what my partner is stating, correct?<br>A: Yeah.<br>Q: Okay, thank you.<br>Q: Okay, and maybe I was mis-wording or something. So, you were assaulting towards them, to try and push them back?<br>A: Yes, sir. |

Mr. McReynolds requests an order prohibiting the Government from introducing evidence regarding Mr. McReynolds' shots, because there is no proper purpose for introducing such evidence and it would be unfairly prejudicial. This evidence is irrelevant to the crime with which Mr. McReynolds is charged. He is charged with disposing of a firearm to a felon in violation of 18 U.S.C. § 922(d). The Government contends that Mr. McReynolds "disposed of" a firearm to Mr. Watkins when Mr. McReynolds yelled "grab my chop." Thus, the conduct for which Mr. McReynolds is being charged ended the moment after he yelled "grab my chop," and any evidence of him shooting back at the perpetrators is irrelevant to that charge.

Further, this evidence would only serve to unfairly prejudice Mr. McReynolds by influencing the jury to convict Mr. McReynolds based on conduct for which he is not charged. The Eighth Circuit has concluded that "[u]nfair prejudice under Rule 403 means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013). Evidence should be excluded under Rule 403 where it "may influence a jury to convict the defendant for conduct not charged in the indictment." *United States v. Garza*, No. 4:22-CR-3034, 2023 U.S. Dist. LEXIS 180492, at *3 (D. Neb. Oct. 6, 2023) (citing *United States v. Frank Iron Hawk*, 612 F.3d 1031, 1040 (8th Cir. 2010)). Mr.

McReynolds is not being charged here with any crime related to his discharge of a firearm. But if this evidence were admitted, the jury may be inclined to convict him based on an emotional reaction to hearing evidence that he shot back. They might also convict him for conduct for which he is not charged in this matter. Accordingly, the evidence is irrelevant, unfairly prejudicial, and should be excluded.

## IV. Motion in Limine 3: Evidence Regarding Alvin Watkins' Statements Are Irrelevant, Unfairly Prejudicial, and Hearsay.

Pursuant to Rules 402, 403, and 802 of the Federal Rules of Evidence, Mr. McReynolds moves this Court in limine for an order precluding the Government from offering evidence of Alvin Watkins' statements on the night of March 10, 2025.

Mr. McReynolds anticipates that the Government will attempt to admit the following portions of a recorded statement which Mr. McReynolds made to Sergeants Gilles Antaya and Brandon Noble:

| Timestamps | Content |
|---|---|
| 12:17:16-12:17:31 | Yeah by the time I start coming back towards my car, I see AB running towards his vehicle, but he was like 'bro I just let off your other one right there,' which my other gun was in my car, which he knew was in my car but he like-- he like-- bro-to back me up-he like bro it was more into it was more than two. |
| 12:22:12-12:22:33 | Q: And then after you fired, you went back towards the parking lot where AB had your rifle? Or your other gun?... That was in your backseat?<br>A: Yeah.<br>Q: And he said he started shooting at people?<br>A: Yeah.<br>Q: Or you said he told you?<br>A: Yeah |
| 12:22:49-12:23:11 | Q: And AB was shooting your-- your firearm?<br>A: Yeah.<br>Q: Okay, where was he shooting at and what was he shooting towards? Do you know?<br>A: I know he told me he was shooting towards the alleyway and the the abandoned spot. He was like 'I was shooting towards the |

| | |
|---|---|
| | alleyway and the abandoned spot by where I seen them at too. He was like 'I seen them when you when you turned around and said 'gun,'" and he turned around he's like-- we all said 'get down' at the same time. |
| 12:34:40-12:34:55 | Q: Did he tell you he fired it?<br>A: He told me after, when I ran towards the car and it's like 'get in the car,' he said, 'I fired your gun, bro, I fired your gun' and I'm like, what, and I'm like 'where's my gun at' and he's like 'it's in your backseat, bro, it's in your backseat.' He's like, 'I was just trying to defend them off of you.' |
| 12:40:23-12:40:34 | Q: and then when you came back, AB told you he had taken your rifle?<br>A: Yes, he say he fired my rifle.<br>Q: Your rifle. He said-- he told you that. |
| 12:59:43-1:00:00 | I know I seen AB closing my door. He was like, 'man, I was trying to get them off of you bro. I was trying to keep them off of you.' He was like, 'I threw [your] toy in the backseat.' And I'm like, 'dang bro, you threw my toy in the backseat?' Like, 'what the heck bro?' 'Why you grab my toy-- touch my toy?' |

Mr. Watkins' statements about his own conduct are irrelevant to whether Mr. McReynolds disposed of a firearm to a prohibited person. Even if it is true that Mr. Watkins told Mr. McReynolds that he fired Mr. McReynolds' firearm after the fact, that would not make it any more or less true that Mr. McReynolds knowingly transferred a firearm to Mr. Watkins or that Mr. McReynolds knew Mr. Watkins was a felon. If these statements are admitted, they would be unfairly prejudicial, because the jury may be tempted to punish Mr. McReynolds for the conduct of Mr. Watkins.

Further, in these statements Mr. McReynolds explains things that Mr. Watkins told him the night of March 10, 2025. Those are "statements" that the declarant (Watkins) did not make "while testifying at the current trial" and which the Government intends to offer "in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. They are hearsay and not subject to any definitional exclusion under Rule 801(d) or exception under Rules 803 or 804. Indeed, Mr. Watkins' statements are not admissible as

statements by a party opponent, because Mr. Watkins is not a party opponent in the case against Mr. McReynolds. *See United States v. Sherman*, Nos. 4:01CR00212SWW, 4:07CV112SWW, 2007 U.S. Dist. LEXIS 37066, at *6 (E.D. Ark. May 18, 2007).

Accordingly, the Court should exclude Mr. McReynolds' recounting of what Alvin Watkins told him pursuant to Rules 402, 403, and 802.

## V. Motion in Limine 4: Evidence of the Existence of Mr. McReynolds' Bodyguard and/or Security Guard License is Irrelevant.

Mr. McReynolds seeks to exclude evidence of whether he was a licensed security officer as irrelevant under Rules 401 and 402. Specifically, the Government has stated that it intends to offer a statement of Will Smith from the Minnesota Board of Private Detective and Protective Agent Services to establish that Mr. McReynolds did not have an active bodyguard license. The Government may also seek to introduce the following portions of Mr. McReynolds' police interview:

| Timestamp | Content |
|---|---|
| 12:00:58-12:01:01 | I do the 21 Days of Peace, but I do security. I do private security for them. |
| 12:01:52-12:02:54 | Q: And you said, so you do the armed security for 21 Days of Peace?<br>A: Yes.<br>Q: Okay so you're hired by 21 Days of Peace to do the armed security for any function or anything else?<br>A: Yes.<br>Q: Okay and that evening you were there for 21 Days of Peace as the armed security?<br>A: Yes, sir.<br>Q: Okay and you said you're not allowed around anybody with felonies like in the neighborhood?<br>A: No, that work for 21 Days of Peace? Okay like there's a distance for me to be away from the others for me, you know what I'm saying, not to be so-called saying that all of them around this person or around a person with a firearm for them to get in any trouble because they like-- because most of them really don't know that I really be carrying other than probably like four to five |

| | |
|---|---|
| | people knows that I-- that I carry, so I don't let it be known … [inaudible] I'm just like, man, I do security. |
| 12:03:27-12:03:44 | A: I run my own security company.<br>Q: What's the name of your security company?<br>A: Legacy Security Bodyguard Forces |
| 12:44:32-12:33:36 | I get paid to bodyguard people and secure people. |
| 12:53:44-12:54:05 | Q: Do they pay for your security stuff at all?<br>A: No, sir…<br>Q: So do they keep the documentation then?<br>A: What-- the documentation of what?<br>Q: For your stuff, since they're hiring you as security?<br>A: No they don't. Not at all. |
| 12:28:59-12:29:08 | Q: Okay so you're certified through-- to be a security officer?<br>A: Yes, sir.<br>Q: Perfect. A: Security officer, bodyguard, private detective. |
| 1:31:04-1:31:17 | I do it for George Floyd square. I do it for the Caribbean Festival. Those are my main two big contracts that I just got for armed security. |
| 1:31:52-1:32:05 | I just do my security of me being private security for them. So I let them know that, yeah, I'm you guys's private security, that I'll do the private security but I'll still be hands on with learning the basics and stuff that you do. |

The Government's position is that this information is necessary to correct the record given that Mr. McReynolds stated in his police interview that he was a licensed bodyguard. However, whether or not Mr. McReynolds was a licensed bodyguard is irrelevant to the elements of the crime charged. Accordingly, Mr. McReynolds moves for an order prohibiting the Government from offering Will Smith's statement and the above-listed portions of the police interview.

Dated: September 16, 2026

DORSEY & WHITNEY LLP

By s/ *RJ Zayed*

RJ Zayed (#0309849)
zayed.rj@dorsey.com
Ian Blodger (#0398254)
blodger.ian@dorsey.com
Caroline Rogers (#0403732)
rogers.caroline@dorsey.com

50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Defendant McReynolds*

**WORD COUNT COMPLIANCE**

The undersigned attorney for Mr. McReynolds hereby certifies that his Motions in Limine comply with the word count requirements of the Court's Practice Pointers and Preferences. Motion in Limine 1 contains 954 words; Motion in Limine 2 contains 2,322 words; Motion in Limine 3 contains 712 words; and Motion in Limine 4 contains 534 words. This document was prepared using Microsoft Word, and the word count function in this program was applied to include all text, including headings, footnotes, and quotations.

Dated: September 16, 2026

DORSEY & WHITNEY LLP

By s/ *RJ Zayed*
RJ Zayed (#0309849)
zayed.rj@dorsey.com
Ian Blodger (#0398254)
blodger.ian@dorsey.com
Caroline Rogers (#0403732)
rogers.caroline@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

*Attorneys for Defendant McReynolds*